This case is A-LERT Construction Services v. Workers' Compensation Comm' 5-1-1-0-0-7-9. Counsel, please. May it please the Court, Mr. Delano, Robert McGrath here on behalf of A-LERT Tate & Lyle. This is our appeal, and it's our position that the Industrial Commission's decision as a matter of law is incorrect. It's also our position that it is against the manifest weight of the evidence. Mr. Dilley started his employment with A-LERT January 5, 2007. As a condition of his employment, he signed the company drug abuse policy. That policy allowed us to perform drug testing, allowed us to use the information regarding the drug testing, and waived his physician-patient privileges. When he started his employment, he got very detailed training on fall protection and use of safety equipment to rescue someone should they fall. And that documentation is in the record. The evening prior to the date of this occurrence, Mr. Dilley admitted to using cocaine, and he admitted to drinking a couple of beers. He started his employment on May 7 in the morning. He reported to a large construction site about two and a half blocks in diameter. And the day started with a safety meeting at 6.30 in the morning. One of the exhibits is documentation concerning the job hazard assessment. That's what goes on in these safety meetings. Fall protection was discussed. Use of the various equipment was discussed. And the employees are required to sign, in a sense, a test that they're fit for duty. Mr. Dilley, knowing even that he used cocaine on the day before, signed that form indicating he was fit for duty. About 7.15, that meeting breaks up. The testimony is that he goes to get his equipment, and then he goes to a location where he is unfastening and trying to reconnect fire. The petitioner during this process is having difficulty doing the connection. He's working with Mr. Mejia. Mr. Mejia was able to do his connection. And it got to the point where Mr. Dilley was frustrated and made a decision to take a break. He took a break about 9.30. He went back to try to reconnect the iron at about 10 o'clock. At this point in time, he still had difficulty performing his job. He wound up getting in a fight with Mr. Chad Hall, who was, in a sense, acting as his supervisor. Mr. Dilley accused Mr. Hall of not reading the blueprints correctly. That's why he was having problems with the fitting. Mr. Hall said that, hey, you're taking too long to do this fitting. I'm coming up. It was at that point in time that Mr. Dilley turned on one of the beams and lost his footing and fell. He was properly attached to his safety harness, and he wound up striking a rail and, I believe, fracturing his hand. Would Mr. Hall testify to his observations of the petitioner that morning prior to the fall? He did. Mr. Hall and Mr. Edwards both testified as to their observations prior to the fall. Their observations, and Mr. Hall and Mr. Edwards wound up or were living together at the time of this accident. They shared an apartment. They testified that they didn't really notice anything about the petitioner. But remember, we're not dealing with alcohol. We're dealing with cocaine. Did anyone say they noticed anything about the claimant? No, none of them did. Everybody on the scene said that he was capable of doing his job in New York. No one noticed anything unusual about him. When I asked Mr. Hall how he would determine whether or not someone was under the influence of cocaine, his testimony was, I don't know. An investigation was performed by the employer who also uncovered no indication that the claimant was unable to perform his job. Other than, Your Honor, he was having problems fitting the iron, which no one else had a problem doing. So although they said... But he didn't fit Mr. Mejia, who he was working with himself, when they came back from the break, the degree that the piece wouldn't fit, is it? I would disagree with that, Your Honor. Mr. Mejia and the accident investigation report prepared by Mr. Allen established that he was able to... Mr. Mejia was able to connect the iron properly. On his end? On his end. The only person that had any difficulty connecting the iron whatsoever was Mr. Dilling. And, in fact, Mr. Hall got angry with him and said, I'm going to go up there and do it myself. And Mr. Edwards also said that Mr. Hall was reading the blueprints incorrectly and giving him the wrong piece to try to put in there. So there's a disputed issue, in fact, on whether he couldn't get it to fit or if it just wouldn't fit because it was the wrong piece. But Mr. Allen, Mr. Hall, if you read the testimony, disagreed with that statement. He said he had no conversation with Mr. Edwards that day about the iron fitting properly in. Mr. Edwards wasn't assigned that task that day. Counsel, aside from the issue of Hall and Edwards, Assume for the sake of your argument that there was cocaine in the claimant's system at the time of the accident. Is the state of the law such that that would automatically bar recovery under the Act? Or are there some additional considerations that have to be weighed? Under Paganellis, and when the court discussed Paganellis, there was discussion concerning Professor Larson. And the discussion was that cocaine or intoxication doesn't have to be the sole use, I mean the sole cause. If it's a cause or if the intoxication is sufficient to remove that person from his employment. That's what Paganellis said. That's not what the Supreme Court said in peril. In peril, the Supreme Court said the intoxication will bar recovery if the intoxication is the sole cause of the action. Or is so excessive that it constitutes a departure from employment. I would agree that's what the court said in peril. And what is your best evidence that the intoxication incapacitated this plaintiff from his work? Because he couldn't fit it together? No. No, the best evidence, your honor, is the sole medical testimony in this case. The sole medical was that the cocaine use resulted in his intoxication. And that went in unrebutted. From who? It was Dr. Chodo? Right. Chodo. Chodo. His first, he actually had two reports. He said that the level of intoxication, the cocaine test showed that he was intoxicated. Really? And his report said that that cocaine intoxication results in impaired reflexes. Okay. Good. Falling. Okay. Impaired reflexes and poor judgment. And when we talk about poor judgment, I don't think any of you honors sitting there today, if you were specifically trained on fall protection and the use of buckets and other equipment to get you. Mr. Macaroski, do you think that in any of these cases where it dealt with intoxicated drivers of motor vehicles, that anyone would suggest that their reflexes weren't dulled a bit? And in each one of these cases, both the Supreme Court, the appellate court, has turned around and said, you've got to prove that it's the sole cause, or that it's so bad that it constitutes a departure. And I think in this case it was so bad that it constituted a departure. What's the evidence of that? There's no explanation for this individual after all the training he received on fall protection and the training he received that day to be in the air suspended and unhook your harness, unhook the thing that's keeping you suspended and preventing you from falling.  Okay, just a minute. His explanation was that, and he had a punctured lung in the initial fall, that he couldn't breathe and he panicked and cut himself loose. That doesn't sound so crazy to me. You know, why is that such a crazy... The only evidence you can show as to the degree of injury after the fall was the fractured hand. When that punctured lung came about, there's no testimony to say that was after the initial strike. Let me just point out one other thing here too. Your doctor, that's what you're relying on, is his testimony, or his report. He said, at this level of intoxication would include impaired reflexes as well as judgment, and in my opinion must be presumed as a cause of the accident. Even your medical testimony that you're relying on doesn't say it's the sole cause. His second report, Your Honor, said it was the cause of the accident. The cause of the accident. And he said it was the cause of the accident. There's two reports in the evidence. He said that it was the cause of the accident. Are those in the appendix to your brief? They would be, yeah, they were exhibits, Your Honor, in the transcript. How did it change from a cause to the cause? What precipitated that? I believe the question was asked based upon all of the, and it's in my brief, the question was asked based upon all the evidence, the positive cocaine test, what was your opinion as to the cause of his accident? And the doctor testified that the cause of the accident was his use of cocaine, that it was his impaired reflexes, number one, that caused him to fall, and number two, the poor judgment in unhooking your harness that resulted in falling 18 feet. I don't think you're going anywhere with that one, with the poor judgment of unhooking his harness. I'm with him. If I've got a broken lung, I want to loft that harness for a punctured lung. So the solution? So this man, not a single person complained about his ability to do his work that morning. Nobody. Because you can't, none of you individuals that are sitting there, none of you can tell me, unlike intoxication, Your Honor, if someone is on cocaine. I couldn't look. Nobody can tell if they're intoxicated. And cocaine ingestion produces a form of intoxication. Cocaine ingestion produces reflex problems and judgment problems. And in the cases that we talked about, and I cited in my brief, if you look at the bartender case, which was a parole case, everyone in that case, all the patrons said, although she tested positive for alcohol, she was able to function. They noticed nothing unusual about her function. But the court relied on the testimony of the expert. But the commission doesn't have to do that. It could go either way. In this case, you have Paul and Edwards, who are working along with the claimant, saying he showed no physical manifestations of intoxication. They weren't working with him alongside him through the whole course of the day. They attended a safety meeting. And you tell me that you're attending a safety meeting with 12 other people and you're watching what the other person is, how they're reacting versus listening to what the safety hazards are that day? If under the standard of he's so far intoxicated that he's incapable of performing his job, yeah, probably somebody would notice there's something wrong. Well, he wasn't able to perform his job. Contrary to what Mr. Edwards said and what Mr. Hall said, you've got to remember, these guys lived together. They also said that it rained that day when every single record disputed that. They didn't observe anything unusual about him. In fact, Mr. Hall, I can't tell if someone's on cocaine. I can't describe to you how they appear. Mr. Edwards would ask the question. He said the person was buggy-eyed. None of those people could actually describe what someone's physical appearances is on cocaine. When you look at the Paro case, everyone testified that that person's appearance was fine, yet they looked at the expert's testimony. There's no conflicting testimony here. There's no conflicting facts that he admitted to taking the cocaine. He tested positive for it. It affected his reflexes, and it affected his judgment. Does McKernan help you? Excuse me, your Honor? Does the McKernan case help you? I am not that familiar with that case to answer yes or no, but the Rogers case helps me because that was an individual who was able to perform his job five or six times over. It was on the sixth time, I believe, that he used poor judgment in trying to catch this falling object. The expert testified that he was under the influence. That was the cause. They relied on the expert. And I cited the Interlake case, where the Interlake case stands for the proposition that when something is beyond that to which the general public has knowledge of, how does someone appear when they're under the influence from cocaine, the court should rely on the expert testimony. I have the only expert testimony. I have the only explanation for his fault. He did that job from January to May without problem. He never testified to having problems with anything before that day. You have time on rebuttal. Okay, so I'd ask that you find as a matter of law that this is an individual, and that this is a matter of justice. Counsel, please. Please support counsel. I'm Charles Delano, and I represent Mr. Dilley. A couple points. I have the two reports from Dr. Ciotto here, I believe. I don't have the site to the record, but one is dated June 7, 2007, and one is dated June 22, 2007. And I believe those are the reports that were evidence. The report dated June 22, 2007 has two paragraphs, essentially. The second paragraph concludes with the words, in my opinion, must be presumed as a cause of the accident. I am unable to find anywhere where it says the cause of the accident. Excuse me, that's been stated before by counsel. I can't find it. Secondly, with regard to the Paro decision, which counsel was talking about, we had a bartender who fell down the stairs, and there were several lay witnesses who said they thought she was performing her job well. Medical evidence showed afterwards that the blood alcohol count was elevated. The Industrial Commission ruled, or the Workers' Compensation Commission, in this case, ruled that we are going to accept the medical evidence over that of the lay witnesses because some of them had left, et cetera. The Supreme Court said in reviewing that, the evidence in the case at bar could conceivably support a variety of inferences, and we will not substitute our judgment for that of the Commission merely because we might have drawn different inferences from the same record. And I think that's the case here. Mr. Hall testified that he believed the petitioner was, in fact, performing his job properly. Mr. Hall was with him throughout the morning. This was a man who was in charge of walkie-talkie use between the crane operator and himself as to where to direct the steel. Mr. Edwards said that he had worked with the petitioner for a number of years. He saw him throughout the morning, and he was performing his job properly. The petitioner testified that he believed he was performing his job properly. The emergency room personnel at St. Elizabeth's Hospital, where the petitioner was taken, also indicated that he was at work morning times three, and there was nothing in the records to indicate that he was in any way incoherent after falling that far. He was experiencing a great deal of pain, et cetera, but nothing about his mental systems were impaired. So for those reasons, Your Honors, I believe the decision of the arbitrator, the Commission, and the Circuit Court should be affirmed. Thank you, counsel. Your Honor, there are two reports, June 7th, 2007, and the first report indicates that Mr. Dilley was intoxicated at the time of his injury, May 4th, 2007. The second, June 22nd, 2007, report does use the word ache. Now, in terms of cases, in terms of what these two employees observed, they worked with him the entire day. They admitted one person said if someone's on cocaine, they have buggy eyes. The other person said they couldn't tell. Let me ask a question. Does it matter whether they know what a person on cocaine looks like if they're able to testify that from everything they saw, he was able to perform his job, and was performing his job? For a couple hours. And what tasks did they observe him? Sitting at a safety meeting? How much attention did they pay? And they were at Mr. Hall's. He was there watching. And Mr. Hall said he couldn't do his job. Mr. Hall said he couldn't enhance it. You're talking about the same guy who said he didn't see anything about his inability to do his job. He said he didn't get the bolt in the end. Right, at the safety meeting he said he didn't see anything, but he was the one. And Mr. Dilley, when you say was he doing his job, he got so frustrated between 9 and 10 o'clock that he wanted to take a break because he couldn't make the connections. And there's no explanation, with all due respect to Hoffman, if I'm hanging suspended, that's the only way that's going to prevent me from falling. Even if I, for purposes of argument, say I've got problems breathing, the solution isn't putting the rope so you fall 18 feet. That's not the solution. I have the only medical testimony, the only medical testimony, that shows that his use of cocaine affected his reflexes, affected his judgment. There's no other explanation for this fault. He admitted that if he just stayed where he was at. I don't think anybody disputes the fact that his cocaine use may have contributed to the fault. That's not the question. But, Your Honor, there's nothing to say that any of his work activities caused or contributed to the fault. What about his work caused his injury? He was properly harnessed. If he stayed in his harness, okay, he would have never had these injuries. If he used all the training that he had, even that morning, if he was really paying attention, there was a bucket there that they could have used, he admitted, if he just stayed there, someone would have gotten him. It's the poor judgment. It's the use of cocaine. And it sends a bad message. You're saying it's okay for somebody to show up from work, disregard the rules, put everybody else in danger, including himself, because someone says they saw him for a period of an hour or two, appearing to be fine. Well, that's not what the court did in DeRogers. That person appeared to be fine when he did his job. Excuse me, Mr. Fairbairn. This is the fourth time you've quoted that case. That is a Workers' Compensation Commission case. It should never have been cited in your brief, and it certainly should not be quoted else. All right. I agree. But it sends a bad message. It was his cocaine, according to our medical experts. It was his poor judgment. There's nothing else here. There's nothing else in God's green earth that would have somebody disconnect their harness and fall 18 feet if their judgment wasn't impaired by the use of cocaine. We ask that you send the right message. I don't know how else we could protect the workplace. We had to sign the drug policy. We had him attest that he was fit for work. How else do we protect the workplace? Well, the new amendments. I think you've taken care of that, haven't you? Well, the new amendments take care of it in part, but we still have to go through, and there's a rebuttable presumption. But in this case, we have the only medical expert. You should rely on the medical expert, and this case should be reversed. Thank you. Thank you, counsel.